WEAVER *v.* RICHARDS.

1. VENDOR AND PURCHASER—CONTRACT TO CONVEY—MERCHANT-
ABLE TITLE.
   Under a contract to convey land, the vendor is bound to con-
   vey to the purchaser a merchantable title, viz., one which is
   unassailable on the face of the record as well as in fact.

2. BROKERS — RIGHT TO COMMISSIONS — FAILURE TO SELL — TITLE
OF VENDOR.
   Where a sale of land, negotiated by plaintiff for defendant,
   failed because the record did not show that the defendant had
   acquired the alleged outstanding interests of two heirs in the
   land, plaintiff's right to recover commissions is not affected
   by the fact that at the time of the purchaser's refusal to
   accept title there was a will in existence under which defend-
   ant acquired full title to the property, of which will none of
   the parties had knowledge.

3. PRINCIPAL AND AGENT—AUTHORITY TO CONVEY LAND—REVO-
CATION—DEATH OF PRINCIPAL.
   A power appointing an attorney to sell all the property of the
   estate of a deceased person belonging to the signers of the
   power, and to receive and distribute the proceeds, containing
   an express provision that it shall be irrevocable and survive
   them if any of the parties should die, does not constitute a
   power coupled with an interest, and is therefore revoked by
   the death of certain of the grantors prior to the exercise of
   the power. GRANT and BLAIR, JJ., dissenting.

Error to Emmet; Shepherd, J. Submitted February 9,
1905. (Docket No. 122.) Reargued April 4, 1906.
(Docket No. 2.) Decided July 3, 1906.

Assumpsit by John W. Weaver against George D.
Richards for a commission for the sale of land. There
was judgment for defendant on a verdict directed by the
court, and plaintiff brings error. Reversed.

Plaintiff claims that he procured a purchaser for the
defendant of certain lands owned by him, under an agree-

ment that he, plaintiff, should receive all the purchase price over and above $6,000; that he found a purchaser for $8,000; that the proposed purchaser finally refused to accept a warranty deed from the defendant, because his attorney advised him that defendant had not a marketable title. The court directed a verdict for the defendant. Plaintiff claims under a parol contract, which he states as follows:

" Mr. Richards stated to me—we had a long talk at my house, and I was to have all I could realize over $6,000 net to Mr. Richards. I says, ' All right, I'll go ahead and sell those lands.' And he says, ' You can have all you can realize over $6,000 net.' In pursuance of this conversation, Mr. Richards and I went to Grayling with the deed for the Michelson & Hanson Lumber Company. I went there before this time that Richards and I went there together. I went down there and made the sale to Michelson & Hanson Lumber Company. The price agreed to be paid by them was $8,000."

Three days afterwards defendant went to Lansing, paid all the back taxes upon the lands, and wrote the plaintiff a letter authorizing him to sell the lands on certain conditions named therein, which conditions plaintiff claims were not in the original parol agreement. It is unnecessary to state the contents of this letter. Plaintiff notified the defendant of the proposed purchase, and directed him to make a deed to Salling, Hanson & Co., the proposed purchaser and grantee. Defendant duly signed and acknowledged a warranty deed of the lands to that company. Plaintiff and defendant then went to the office of the company to carry out the sale. The officers were not at home. The deed was then left at a bank, to be delivered on payment of the purchase price, $8,000, of which $6,000 was to go to defendant, and $2,000 to plaintiff. With the deed was also left an abstract of title. The company submitted the papers to its attorney, who advised it that, in his opinion, defendant was not possessed of the entire title. Consequently the sale was not con-

summated.    The deed made by the defendant and left at
the bank was returned indorsed :

"Sale not made.    This deed refused and returned to
grantor April 7, 1900."

The title to the lands formerly was in James Gibb Ross,
of Quebec, Canada, who died in October, 1888.    He was
at the time believed to be intestate.    An administration was
had upon his estate.    He owned lands in the county of
Marquette, and the probate court there determined that
his heirs were two brothers, William and Frank Ross,
each entitled to a one-third interest in the estate; and
John Theodore, Annie, and Frances Ella Ross, children
of a deceased brother, each being entitled to a one-ninth
interest in the estate.    The defendant derived his title by
conveyances from these heirs.    Among these muniments
of title were some powers of attorney.    Mr. Alexander,
the attorney for Salling, Hanson & Co., testified:

"I examined the abstract and deed.    The deed was
not delivered as a matter of law—only conditional upon
the terms of agreement.    *.  *  *    My clients desired me
to go to Cheboygan and examine the records to verify
the correctness of the abstract.    I did so, and found that
the abstract was a correct statement of the condition of
the title as shown by the records.    I reported to my client
that in my judgment Mr. Richards did not possess a rec-
ord title to a one-ninth undivided interest of Annie Ross,
and an undivided one-third interest of William Ross.
*  *  *    My reason for saying that there was a question
of title is because I thought those powers of attorney, and
the conveyences under them, did not convey the interest
of William and Annie Ross, and it was upon this ground
that I turned down the transaction of sale.    *  *  *    I
therefore reported to my clients that in my judgment Mr.
Richards did not possess a record title to a one-ninth un-
divided interest of Annie Ross, and a one-third interest of
William Ross, and that it would not be safe for them to
rely upon the title to the entire interest in the lands."

The principal objection of the attorneys to the title is
based upon an agreement and power of attorney, executed
by the heirs of James Gibb Ross, and the fact that sub-
sequent to its execution and before the sale and convey-

ance of the land in question by the attorneys two of the parties, William and Annie Ross, had died, and that thereby the power of attorney was revoked, and the deed from the trustees, or attorneys in fact, was therefore void. This agreement and power of attorney, executed in Quebec, Canada, is long, but, as the purport and intent of that instrument can better be understood from a perusal of it in its entirety, we give it in full. It reads as follows:

"On this, the fifth of the month of October, in the year of our Lord one thousand eight hundred and eighty-eight, before me, William Noble Campbell, the undersigned notary public, for the Province of Quebec in the Dominion of Canada, and residing in the city of Quebec, personally came and appeared and were present William Ross, of the city of London, in England, Esquire, merchant, Frank Ross of the Banlieue of the city of Quebec, Esquire, merchant, John Theodore Ross, Esquire, merchant, and Miss Annie Ross, spinster, of the full age of majority, these two last of the city of Quebec, the said John Theodore Ross being a party to these presents, as well as in his individual capacity as in his quality of tutor, duly appointed in law to Miss Frances Ella Ross, a minor, the said William Ross, Frank Ross, John Theodore Ross, Annie Ross and Frances Ella Ross being the sole heirs at law of the late Honorable James Gibb Ross, in his lifetime of the city of Quebec, merchant, and a Senator of the Dominion of Canada, who departed this life on the first day of October, instant, intestate, his said heirs at law being, to wit, his brothers, the said William Ross and Frank Ross, and the sole representatives of his brother, John Ross, in his lifetime of the city of Quebec, Esquire, merchant, deceased, namely, the said John Theodore Ross, Annie Ross, and Frances Ella Ross, which said parties did, in the presence of me, the said notary, declare that with the view of winding up and dividing among themselves the estate of the said Honorable James Gibb Ross, they have covenanted and agreed, and do covenant and agree among themselves together as follows; that is to say:

"The said William Ross and the said Annie Ross do hereby appoint and constitute the said Frank Ross and John Theodore Ross to be jointly and severally their agents and attorneys irrevocable in and for the administration and winding up of the said estate, and

the selling and division of the proceeds of the same, according to law, with full power and authority for and in the name and on the behalf of the said William Ross and Annie Ross, or in any legal manner soever to ask, demand, recover and receive of and from all and every person or persons whom it doth, shall or may concern, all and every the sums of money, both principal and interest, costs and charges, goods, wares, merchandise, effects and things whatsoever that now is or are, or hereafter shall or may be anyways due, owing, payable or belonging to the said estate, and whether such moneys as aforesaid be due, by bill, bond, note, obligation, account, or under and by virtue of any contract, deed or instrument in writing, or by operation of law, or under and by virtue of any judgment or judgments of any court or courts, or otherwise howsoever; also for the said Frank Ross and John Theodore Ross for and on behalf of the said William Ross and Annie Ross, as such heirs aforesaid, and in their name to examine, settle, adjust and balance all accounts with any person or persons touching or concerning the premises, and to compound, compromise, arbitrate, conclude and agree upon for and respecting all differences and disputes which may arise, grow or be moved in the premises, and what shall be agreed upon, to receive, and of everything that shall be recovered and received by virtue of these presents, to give good and valid receipts and discharges, also for in the name and on behalf of them the said constituents to make, sign, accept, and endorse any bills, promissory notes, drafts, bills of exchange, as the business of the estate of the said late James Gibb Ross may require, and to negotiate the same at any of the chartered banks carrying on business at Quebec, and to draw cheques on any of the said banks for the purposes of the business of the said estate, and to borrow such sum or sums of money and discount such note or notes as they, the said Frank Ross and John Theodore Ross, or either of them, shall deem necessary or advisable in the interest of the heirs or of the said estate, and the signature to be used by the said Frank Ross and John Theodore Ross, or either of them or their substitute or substitutes shall be either 'estate late Jas. G. Ross,' or 'Ross & Co. in Liquidation,' as may be thought convenient or advisable in the discretion of the party entitled to use and using the same; also for and in the name and on behalf of them, the said William Ross and Annie Ross, or in any legal manner to sue, commence and prosecute any action or actions,

suit or suits at law, appear in any court or courts, whether of original or appellate jurisdiction, and before all judges and justices, there to answer, defend and reply to all matters and causes touching or concerning the said estate, refer and defer the serment decisoire, and to do, say, pursue, implead, seize, sequester, arrest and attach persons and effects in the interest of the said estate, and to sell and dispose of the real estate and immovable property in the city of Quebec and elsewhere, belonging to the said estate of the late James Gibb Ross, as they, the said Frank Ross and John Theodore Ross, may deem necessary or advisable, and to give good and valid receipts for the purchase price thereof, and generally all and singular the affairs and concerns of the said estate to manage, negotiate, transact and conduct, liquidate, adjust and settle as fully and amply to all intents and purposes as the said William Ross and Annie Ross, or either of them, might or could, if personally present and acting in conjunction with the other heirs at law of the said late Honorable James Gibb Ross, and without that, any further or other authority shall be necessary or requisite than these presents, and to sign, seal and execute and deliver all such deeds, instruments, documents and writings as shall or may be necessary or needful in the performance of the premises or any of them, and one or more attorney or attorneys, procurator or procurators for all or any of the said purposes under them or either of them, the said Frank Ross and John Theodore Ross to substitute and appoint, the same at pleasure to revoke, and one or more clerks, agents and accountants to appoint and employ at the city of Quebec or elsewhere, at the costs and charges of the said estate, with power to change, dismiss or replace them at pleasure.   Hereby ratifying, allowing and confirming, and agreeing to ratify, allow and confirm all and whatsoever, the said Frank Ross and John Theodore Ross jointly or separately, or their substitutes shall jointly or separately legally to do or cause to be done by virtue of these presents, and declaring that in the management of the said estate the said Frank Ross and John Theodore Ross shall not be held liable for any errors of judgment.

" And it was further covenanted and agreed between the said parties in the presence of the said notary, that should either or both of the said William Ross and Annie Ross die before the said estate shall have been finally wound up, then that the said Frank Ross and John Theodore Ross, or the survivor of them, shall continue to manage and

wind up the said estate in like manner as though the said William Ross or Annie Ross, or both of them, were still living; but that in case of the demise of either of the said William Ross or Annie Ross, the said Frank Ross and John Theodore Ross, or either of them, if only one of them shall then be living, shall be and are authorized and entitled to use the names of the legal representatives of either or both of the said William Ross or Annie Ross, as the case may be, in any suit at law or legal proceeding in which the names of such representatives should appear in like manner as the said Frank Ross and John Theodore Ross are, by these presents, entitled to use the names of the said William Ross and Annie Ross in all legal proceedings connected with the realization and winding up of the said estate. And it has been further covenanted and agreed that the said Frank Ross and John Theodore Ross shall cause to be opened and regularly kept up, books of accounts in which shall be entered and recorded, all assets, debts and transactions of or concerning the management and properties of the said estate, that balance shall be annually taken from the said books, commencing with the first day of May next, duly certified by the said Frank Ross or John Theodore Ross, and handed to whom it may concern. And it was further agreed between the said parties, in presence of said notary, that as a remuneration for the trouble, loss of time, and sacrifices which the said management and winding up of the said estate will entail upon the said Frank Ross and John Theodore Ross, each of them shall be and are hereby declared to be entitled to draw from the funds of the said estate generally the sum of four thousand dollars annually, commencing from the first day of October instant, for the period of five years from this date.

"Thus done and passed at the said city of Quebec, in the office of me, the said notary, under the number one thousand one hundred and ninety-one.

"In witness whereof, the said parties have signed these presents with me, the said notary, the same being first duly read according to law.

[Signed]            "WM. ROSS.
        "            "FRANK ROSS.
        "            "JOHN THEODORE ROSS.
        "            "JOHN THEODORE ROSS,
        "                "Tutor to FRANCES ELLA ROSS.
        "            "ANNIE ROSS.
        "            "W. NOBLE CAMPBELL, N. P."

144 MICH.—26.

Until after the date of this transaction, it was supposed that Mr. James Gibb Ross died intestate. Shortly thereafter a will was found, duly executed by him, which was duly probated in Canada, and admitted to probate in the county of Marquette, Mich. A certified copy thereof and of the probation was introduced in evidence upon the trial. It devised the entire estate to his brother, Frank Ross. There is no evidence of the death of Annie Ross— nothing but a rumor that she was dead. The court held that the defendant had shown a good and valid title.

*Halstead & Halstead*, for appellant.

*Clark & Pearl* and *J. M. C. Smith*, for appellee.

GRANT, J. (*after stating the facts*). 1. Plaintiff agreed to effect a sale of defendant's lands which should net the defendant $6,000. The sale was not effected, and it is urged that the reason for the failure is a defect in title, for which the defendant alone is responsible, and that the plaintiff had performed his contract by finding a purchaser. No bad faith is charged against the defendant. He acted in entire good faith. He believed he had a good title. He was willing to defend it by warranty deed. How the plaintiff obtained knowledge that the defendant owned these lands does not appear. If he obtained knowledge by an examination of the records in the office of the register of deeds, he is chargeable with knowledge of the defendant's title, and would be held to have contracted with reference to it. He does not testify that he did not know what was the defendant's source of title, or that he did not see and examine the abstract which the defendant had. Three attorneys of standing had advised defendant that his title was good. The power of attorney and the deed thereunder had been held valid by the circuit court for the county of Schoolcraft. See *Chicago Lumbering Co.* v. *Powell*, 120 Mich. 51. That case was appealed to this court and affirmed, although the validity of the power of attorney was not discussed, and the

case was determined on other points. Under these circumstances there is no justice or equity in the plaintiff's claim, and, if it can be sustained, it must be by reason of an inexorable rule of law. Plaintiff made no binding contract with the proposed purchaser, the Salling, Hanson & Co. It was under no legal or moral obligation to purchase the land. It could decline with or without reason. It declined because its attorney advised it that there was a defect in the title. The opinion of the attorney is not evidence of a defect. *Brackenridge* v. *Claridge*, 91 Tex. 527 (43 L. R. A. 593). If the defendant had title by adverse possession, clearly the proposed purchaser would not be under any obligation to accept such a title. Would plaintiff in that event have earned his commission? The cases upon such contracts are very numerous. The briefs are very meager upon this important question. Inasmuch as it is unnecessary, we decline to pass upon it, as the case can be disposed of upon the other point. Upon this point, however, see *Blankenship's Adm'r* v. *Ryerson*, 50 Ala. 426; *Garcelon* v. *Tibbetts*, 84 Me. 148; *Gilchrist* v. *Clarke*, 86 Tenn. 583; *Barnard* v. *Monnot*, 34 Barb. (N. Y.) 90; *Park* v. *Hogle*, 124 Iowa, 98; *Knapp* v. *Wallace*, 41 N. Y. 477; *Tombs* v. *Alexander*, 101 Mass. 255; *Stewart* v. *Fowler*, 37 Kan. 677. A full discussion of the question and citation of authorities will be found in Fitch on Real Estate Agency, pp. 107–115, and Rapalje on Real Estate Brokers, chap. 13.

2. It is insisted that the above agreement, containing the power of attorney, necessarily incident to the performance of the agreement, conferred only rights and powers revocable by the death of any of the parties thereto; or, in other words, that the power to sell and convey conferred upon Frank and John is a mere naked power, not coupled with any right or interest which they did not possess before the execution of the instrument. Contracts are always to be construed so as to carry out the clear intent of the parties thereto, unless such intent is unlawful, or opposed to some sound and well-defined policy of the law.

Counsel concede that they find no case the parallel of this in its facts. They cite other cases involving the construction of powers of attorney and reason by analogy from them. Owners of estates, both real and personal, may incumber them, provide for their sale and disposition while they are living, and also after their death, in any manner not inconsistent with the laws prohibiting the entailment of property.

The situation of the parties and the purpose to be attained are of importance in determining the character of the instrument. Here were five tenants in common of a large estate, consisting of both real and personal property, situated in various jurisdictions in Canada and in the United States. The necessity, as well as the wisdom, of placing this estate in the hands of one or more of their number to dispose of and divide the proceeds, is apparent. Under the law each party could apply for partition to the courts in each jurisdiction where the land was located. Such proceedings would be expensive and difficult, and probably would not result in the most beneficial sales. The credits could not be collected, and other personal property sold without the joint action of all. The parties, therefore, wisely came together and executed the above agreement. By it Frank and John agreed to take the possession, control, and management of the entire property for five years, at a compensation of $4,000 each per year. The other tenants in common agreed to this. The power to sell and convey was a necessary part of such a contract. All the expenses of Frank and John and their compensation were to be paid out of the body of the property. They therefore had a lien upon the property for such expenses and compensation. Each surrendered his legal right for five years to proceed under the law for a partition of the estate. They did not retain the right to sell and transfer any of the property in their own name, nor was it to be transferred necessarily in their names by Frank and John as attorneys in fact. The instrument provided the name or names by which the property could

be transferred.    All had a joint interest in the possession,
use, and control of the property.    They all agreed for a
valuable consideration to surrender these rights to, and
place the property and its control and possession in the
hands of, two of their number.    A trust deed would not
have given them more complete power.    The intention of
the parties is commendable and legal.    The purpose to be
attained is not only not contrary to any policy of the law,
but one which the law should specially favor.  ·

The scrivener of this instrument evidently understood
the law governing powers of attorney, for he expressly
provided in accord with the intent and wishes of the
parties that no party thereto should be able to revoke or
renounce the agreement or any part thereof during the
term covered thereby, and made it binding upon their
heirs in case of death.    None of the cases cited by plain-
tiff contain the like provision.    A revocation by the act
of the party or by death would destroy the unity of the
agreement and render it of no avail.    It was the clear and
express purpose of the parties by this instrument to pre-
vent such a result, and to provide for an economical and
speedy collection, sale, and division of the estate.    The
power of attorney, necessarily incident to the execution of
this agreement, cannot, in my judgment, be separated
from the rest of the agreement, and be held to be a mere
naked power of attorney.  ᵒ

Counsel for defendant do not appear to claim that either
party could revoke this instrument by his own act.    In
case of a mere naked power the owner may sell the prop-
erty, the subject of the power, and collect the purchase
price, in which case the only remedy of his attorney is to
sue him for his compensation.    Such was the case of
*Baker* v. *Baird*, 79 Mich. 255.    In this case either party
might convey all his interest in the estate, but it would be
subject to this contract under which upon the division he
would receive only what his vendor would have received.

A mere naked power of attorney is revocable at the will
of the principal, for the reason, as stated by the author-

ities, that "the derivative authority cannot generally exist longer than the original authority." Story on Agency, § 481. Or, as stated by the same author, "upon the general principle that he who alone has an interest in the execution of an act is also entitled to control it." Section 476. The same section of the learned author clearly intimates that if the agent has an interest in the execution of the power, and there is a valid consideration for it, the power is not revocable. To the general rule above stated there are exceptions, viz., where the power is coupled with an interest, or where a consideration is paid for it. Courts have found some difficulty in determining when the power is coupled with an interest. It is generally held that the interest must be in the thing itself, and not in the execution of the power, and that the same instrument must confer the power and convey the interest. Where an executor is vested with the rents and profits for the sale or use of another, the power survives as an authority coupled with an interest. *Peter* v. *Beverly*, 10 Pet. (U. S.) 532. Where the language detached from other parts of the instrument conferred a naked power, but other provisions of the instrument evinced a design that at all events the lands are to be sold, the power was held to survive. *Franklin* v. *Osgood*, 14 Johns. (N. Y.) 553. One authority states the general rule as follows:

"Where an authority or power is given for a valuable consideration, or is coupled with an interest, or is part of a security for the payment of money, or the performance of some other lawful act, it is irrevocable, whether so expressed upon its face or not." *Frink* v. *Roe*, 70 Cal. 296.

It is also said:

"One of the exceptions to the general rule is where the agency is for a definite time. Where the contract of agency is entered into for a certain specified time, it cannot be rightfully revoked before the expiration of that time, except for sufficient cause." 1 Clark & Skyles on Law of Agency, § 160.

Two circuit courts, after careful consideration, have

held this power of attorney irrevocable. *Chicago Lumbering Co.* v. *Powell*, supra, and the trial court in this case.

It is declared by one authority that, if the act authorized must be performed in the name of the principal, the agency is revocable; but, if such act can be performed by the agent in his own name, then it is not revocable. 1 Parsons on Contracts, p. 72. Tested by this rule the power was not revoked; for, by the very terms of the contract, the various acts contemplated need not be done in the name of the principals.

Where certain parties were partners, and they made an arrangement by which certain property was to be disposed of by one of their number, and the property was actually placed in his custody for that purpose, it was said:

"The power vested in the plaintiff was not a naked power, but a power coupled with an interest. The death of the other parties would not have revoked it, and neither will their subsequent transfer of their interest. It would be unjust to allow an arrangement of this kind, entered into to prevent the necessity of legal proceedings and to secure to parties their legal rights and no more, to be made and unmade, at the pleasure of one of the parties." *Beecher* v. *Bennett*, 11 Barb. (N. Y.) 374, 380.

Reinhard, in his work on Agency (section 183), cites as an instance of an irrevocable power "where the power conferred is that the agent may reimburse himself for advances made in the course of the agency," citing *Posten* v. *Rassette*, 5 Cal. 467. That case holds that the power conferred was something more than a mere naked power, but does not state the facts upon which the holding was based. The opinion states that "it was received by Parker as a security for the indebtedness of his principal to him," and held that he had a vested right founded upon a good consideration. It may be that the indebtedness arose by way of advances made in the course of the agency. If so, it would be an authority for the statement of the author. It is said in *Peter* v. *Beverly*, supra:

"It is the possession of the legal estate, or a right in the subject over which the power is to be exercised, that makes the interest in question."

Chancellor Kent said in *Bergen* v. *Bennett*, 1 Caine's Cas. (N. Y.) 1, 15:

"A power simply collateral and without interest, or a naked power, is, when, to a mere stranger, authority is given of disposing of an interest, in which he had not before, nor hath, by the instrument creating the power, any estate whatsoever. But when power is given to a person who derives, under the instrument creating the power, or otherwise a present or future interest in the land, it is then a power relating to the land."

See, also, *Knapp* v. *Alvord*, 10 Paige (N. Y.), 205; *Merry* v. *Lynch*, 68 Me. 94; *Kelly* v. *Bowerman*, 113 Mich. 446; *Baker* v. *Baird*, 79 Mich. 255.

Counsel for plaintiff rely greatly upon *Hunt* v. *Rousmanier*, 8 Wheat. (U. S.) 174. To secure a proper application of that case, it is necessary to consider what was there involved and what was decided. The question arose upon a demurrer to a bill in chancery, which was sustained by the court below and reversed by the Supreme Court. The original bill stated:

"That Lewis Rousmanier, the intestate of the defendants, applied to the plaintiff, in January, 1820, for the loan of $1,450, offering to give, in addition to his notes, a bill of sale, or a mortgage of his interest in the brig Nereus, then at sea, as collateral security for the repayment of the money. The sum requested was lent; and on the 11th of January the said Rousmanier executed two notes for the amount, and on the 15th of the same month he executed a power of attorney, authorizing the plaintiff to make and execute a bill of sale of three-fourths of the said vessel to himself or to any other person, and in the event of said vessel, or her freight, being lost, to collect the money which should become due on a policy by which the vessel and freight were insured. This instrument contained, also, a proviso, reciting that the power was given for collateral security for the payment of the notes already mentioned, and was to be void on their payment, on the failure to do which, the plaintiff was to pay the

amount thereof, and all expenses, out of the proceeds of the said property, and to return the residue to the said Rousmanier."

The bill further set forth another loan and a similar agreement upon the schooner Industry. The demurrer to this bill was sustained, and leave given to amend the bill. The amended bill stated an agreement that Rousmanier should give specific security on these vessels, his offer to execute a mortgage, the consultation of counsel, and his advice that the power of attorney which was executed should be taken in preference to a mortgage, "because it was equally valid and effectual as a security, and would prevent the necessity of changing the papers of the vessels," etc. The prayer of the bill was for a sale of the vessels, and the payment out of the proceeds of the debt due the complainant. Counsel for the complainant in the Supreme Court did not argue the question of the construction to be placed upon the power of attorney standing alone, but insisted that the power was not the contract, and was not intended to embrace the whole contract, and sought to show by parol the entire agreement. Counsel for the defendant insisted that the instruments were mere naked powers of attorney, and became extinct by the death of Rousmanier, and that only a mistake of law was involved against which courts were powerless to afford relief. In stating the claims of the appellant the court said:

"1. That this power of attorney does, by its own operation, entitle the plaintiff, for the satisfaction of his debt, to the interest of Rousmanier in the Nereus and the Industry.

"2. Or, if this be not so, that a court of chancery will, the conveyance being defective, lend its aid to carry the contract into execution, according to the intention of the parties."

The court held that, if the written instrument was to be considered alone, it was a naked power of attorney and was revocable by the death of Rousmanier. It then held that parol evidence was admissible to show the contract

in connection with the power of attorney, reversed the decree, and remanded it for answer. In discussing the question of the power of attorney the learned Chief Justice said:

"As the power of one man to act for another depends on the will and license of that other, the power ceases when the will, or this permission, is withdrawn. The general rule, therefore, is that a letter of attorney may at any time be revoked by the party who makes it, and is revoked by his death. But this general rule, which results from the nature of the act, has sustained some modification. Where a letter of attorney forms a part of a contract, and is a security for money, or for the performance of any act which is deemed valuable, it is generally made irrevocable in terms, or, if not so, is deemed irrevocable in law. Although a letter of attorney depends, from its nature, on the will of the person making it, and may, in general, be recalled at his will, yet, if he binds himself for a consideration, in terms, or by the nature of his contract, not to change his will, the law will not permit him to change it. Rousmanier, therefore, could not, during his life, by any act of his own, have revoked this letter of attorney. But does it retain its efficacy after his death? We think it does not. We think it well settled that a power of attorney, though irrevocable during the life of the party, becomes extinct by his death."

The opinion means that, if the power of attorney had contained the entire contract showing a lien, it would have been a power of attorney coupled with an interest, and the power would have been merely incidental to the contract, and intended as a means to carry it into effect. The name given to an instrument is not controlling. Its contents control its character. What difference can it make whether the instrument creating and conveying a lien or other interests, and containing within it the necessary power for execution, be called a power of attorney, or a contract, or a mortgage? We must look to the four corners of the instrument to determine what the contract is, and when that is ascertained it should be enforced. In this case the instrument contains the entire agreement, recites the consideration, transfers the possession of the

property to the trustees or attorneys, conveys the unlimited control of the property for a definite period, and minutely describes how the agreement shall be enforced, and in unequivocal terms makes the agreement binding upon themselves and their heirs. In my opinion the decision of *Hunt* v. *Rousmanier*, supra, is not opposed to the validity of this agreement. On the contrary, it is there held that parties may make a contract not to change their will. If they may do this, why may they not make such an express contract binding upon their heirs, so long as the law against the entailment of estates is not violated? The contract in this case evinces a design that at all events the lands were to be sold. *Franklin* v. *Osgood*, supra. It was given for a valuable consideration. *Frink* v. *Roe*, supra. It was entered into for a specified time. 1 Clark & Skyles on Law of Agency, § 160. It is similar to partnership property actually placed in the custody of one of its number for disposal. *Beecher* v. *Bennett*, supra.

We do not deem it necessary to discuss the effect of the will afterwards discovered, and which established an absolute title in the defendant, although it was not at the time known either to the defendant, the plaintiff, or the proposed purchaser.

The judgment should be affirmed.

BLAIR, J., concurred with GRANT, J.

HOOKER, J. A judgment for the plaintiff would have been warranted only upon the theory that the defendant was in duty bound to convey to the purchaser found by the plaintiff a merchantable title, i. e., one which on the face of the record, as well as in fact, was an unassailable title. That the defendant's title was in fact such an one is shown in view of the will of James Gibb Ross, as it is thereby made to appear that neither of the deceased persons inherited an interest in the land, and that Frank, his sole legatee, was in a situation to convey, and through his attorney did convey a complete title to the entire premises. At that time, however, the existence of the will was not

known, and all of the parties executing the power of attorney supposed that each was an heir and had inherited an interest in the lands; they having been adjudicated to be such by the probate court of Marquette county. The abstract showed these facts, and we understand that they are not disputed. When it appeared that the conveyance made by the supposed heirs by the attorney of record was open to the claim of invalidity as to two interests, owing to the fact that the two heirs who inherited such interests were dead when the attorney made his deed, the persons who expected to purchase the property declined to accept the deed tendered by defendant, for the reason that defendant's title did not include those interests. As we have said, this was not true, but no one at that time suggested any reason for saying that defendant had full title, except the claim that the power of attorney was not revoked by the deaths. Unless defendant was right in such assertion, the person contemplating a purchase could not be compelled to accept a deed. It would not only be not merchantable, but he might justly claim that defendant had no title to convey, and, had he been bound by an ordinary contract in writing, he would have been justified in refusing to perform it until a valid title should be shown. There was testimony justifying the submission to the jury of plaintiff's claim, that a contract for the sale of the premises by him upon commission was made, and that under that contract he had a right to understand that defendant would exhibit or prove that he had a valid title to the premises. 2 Page on Contracts, § 664; *Carr* v. *Leavitt*, 54 Mich. 540; *Hannan* v. *Prentis*, 124 Mich. 417; *Stange* v. *Gosse*, 110 Mich. 155. See, also, *Brackenridge* v. *Claridge*, 43 L. R. A. note, 609, 612 (91 Tex. 527). See *Roche* v. *Smith*, 51 L. R. A. 510 (176 Mass. 595); *Livermore* v. *Crane*, 57 L. R. A. 402 (26 Wash. 529); *Mattes* v. *Engel*, 15 S. Dak. 337; *Corder* v. *O'Neill*, 176 Mo. 438; and other cases cited in 4 L. R. A. Cases as Authorities, 913.

This leaves the defense to stand upon the claim that

the power of attorney was not revoked by the death of the two heirs. The power of attorney was included in a contract between the heirs, whereby they agreed to and did appoint one Conolly, attorney, to sell all of the property of the estate of James Gibb Ross belonging to them, and to receive and distribute the proceeds. It contained an express provision that the power should be irrevocable and should survive if any of the principals should die. It is also contended that it survived because coupled with an interest in the land. The reason usually given for the rule that death revokes a power is that, as the act authorized by the power is to be done for and in the name of the principal, it cannot survive the power of the principal to act, which is terminated by his death. Upon this rule is ingrafted an exception, viz., that where the instrument creating the power conveys to the attorney the legal title to the interest covered by the power, it (the power) survives. But this must be an interest in the thing itself, and must be created by the instrument creating the power, and if it be an interest only in that which is to be produced by the exercise of the power it is not within the exception.

Both of these questions are fully discussed and covered by the decision in the case of *Hunt* v. *Rousmanier*, 8 Wheat. (U. S.) 174, the leading case in this country. In that case, while he recognized the irrevocability during the life of the person making the instrument of a power which is the subject of contract, Chief Justice Marshall says that even in such a case it does not retain its efficacy after his death, and he clearly shows that a contrary rule would involve an absurdity.

"This general rule that a power ceases with the life of the person giving it admits of one exception. If a power be coupled with an 'interest,' it survives the person giving it, and may be executed after his death.

"As this proposition is laid down too positively in the books to be controverted, it becomes necessary to inquire what is meant by the expression, 'a power coupled with an interest?' Is it an interest in the subject on which the

power is to be exercised, or is it an interest in that which is produced by the exercise of the power? We hold it to be clear that the interest which can protect a power after the death of a person who creates it must be an interest in the thing itself. In other words, the power must be engrafted on an estate in the thing.

" The words themselves would seem to import this meaning. ' A power coupled with an interest' is a power which accompanies, or is connected with, an interest. The power and the interest are united in the same person. But, if we are to understand by the word 'interest' an interest in that which is to be produced by the exercise of the power, then they are never united. The power to produce the interest, must be exercised, and by its exercise is extinguished. The power ceases when the interest commences, and therefore cannot in accurate law language, be said to be ' coupled' with it.

" But the substantial basis of the opinion of the court on this point is found in the legal reason of the principle. The interest or title in the thing, being vested in the person who gives the power, remains in him, unless it be conveyed with the power, and can pass out of him only by a regular act in his own name. The act of the substitute, therefore, which, in such a case, is the act of the principal, to be legally effectual, must be in his name, must be such an act as the principal himself would be capable of performing, and which would be valid if performed by him. Such a power necessarily ceases with the life of the person making it. But, if the interest or estate passes with the power, and vests in the person by whom the power is to be exercised, such person acts in his own name. The estate, being in him, passes from him by a conveyance in his own name. He is no longer a substitute, acting in the place and name of another, but is a principal acting in his own name, in pursuance of powers which limit his estate. The legal reason which limits a power to the life of the person giving it exists no longer, and the rule ceases with the reason on which it is founded. The intention of the instrument may be effected without violating any legal principle.

"This idea may be in some degree illustrated by examples of cases in which the law is clear, and which are incompatible with any other exposition of the term 'power coupled with an interest.' If the word 'interest' thus used, indicated a title to the proceeds of the sale, and not

a title to the thing to be sold, then a power to A. to sell for his own benefit would be a power coupled with an interest; but a power to A. to sell for the benefit of B. would be a naked power, which could be executed only in the life of the person who gave it.   Yet, for this distinction, no legal reason can be assigned.   Nor is there any reason for it in justice; for a power to A. to sell for the benefit of B. may be as much a part of the contract on which B. advances his money, as if the power had been made to himself.   If this were the true exposition of the term, then a power to A. to sell for the use of B. inserted in a conveyance to A. of the thing to be sold would not be a power coupled with an interest, and consequently could not be exercised after the death of the person making it; while a power to A. to sell and pay a debt to himself, though not accompanied with any conveyance which might vest the title in him, would enable him to make the conveyance, and to pass a title not in him, even after the vivifying principle of the power had become extinct.   But every day's experience teaches us that the law is not as the first case put would suppose.   We know that a power to A. to sell for the benefit of B. engrafted on an estate conveyed to A. may be exercised at any time, and is not affected by the death of the person who created it.   It is, then, a power coupled with an interest, although the person to whom it is given has no interest in its exercise. His power is coupled with an interest in the thing which enables him to execute it in his own name, and is, therefore, not dependent on the life of the person who created it."

This case has been cited with approval many times. See *Frink* v. *Roe*, 70 Cal. 310.   The fact that the attorney is given the right to compensation from the proceeds of the sale does not make the power one coupled with an interest.   See *Simpson* v. *Carson*, 11 Or. 361; *Farmers' Loan & Trust Co.* v. *Wilson*, 139 N. Y. 284; *Cassiday* v. *McKenzie*, 39 Am. Dec. 82, and note (4 Watts & S. [Pa.] 282); *Peter* v. *Beverly*, 10 Pet. (U. S.) 532.

The judgment should be reversed, and a new trial ordered.

CARPENTER, C. J., and McALVAY, MONTGOMERY, and OSTRANDER, JJ., concurred with HOOKER, J.